Good morning. May it please the Court. My name is John Ahlers. I represent Baugh-Skanska, a Pacific Northwest builder and general contractor. This case involves the Fort Lewis Barrage Project, one of the many projects down there. And what we have... You better get a refund from your chart company. It's fine. We have the small versions as well. Wrinkled bed sheet up there. I'm sorry. I'd like to reserve five minutes for rebuttal. This case involves the U.S. Army Corps of Engineers as the owner of the project, Baugh-Skanska. The general contractor, my client, was the general contractor for the project. A beam and column supplier by the name of Nordahl was a supplier to Baugh-Skanska. And the appellee, I think in this case, is Seaport ISSC, Inc, a raw steel supplier. Now, they're seeking, Seaport is seeking $373,283 based on the fact that they believe that their steel was not paid for. Baugh's position in this case is that Seaport was fully paid for the steel based on the interpretation accorded the release that I'll show you in a minute and that only $11,063 remains due under that release argument. Secondly, it is Baugh's position that Seaport was a supplier to a supplier, Nordahl is a supplier, and under the Federal Miller Act, a supplier to supplier is not within the purview of the coverage of the Act and therefore there is no recovery for Seaport. Lastly, there is a genuine issue of material fact here that even if you find that indeed Seaport is within the purview of the Miller Act coverage and the release is inapplicable, there is a genuine issue of material fact here as to the proper allocation of payments that should have been made by Seaport on this project. Now going through those arguments, I would like to first show you the legal issue is the proper interpretation to be accorded this claim waiver and release document and that's ER 717 in the record. This is a release that's commonly used on construction projects, particularly public works projects, where the general contractor is at risk for bond claims by sub-tier suppliers and subcontractors. The right-hand side of that form is an unconditional release that was executed by the President for Seaport. Now as a condition of payment, before payment is made to Nordahl, the sub-tier supplier, Seaport, is required to execute this form and did do that. The right-hand side of the form basically indicates to BAH that the undersigned, in this instance Seaport, has been paid a certain amount of money, but more importantly, the other highlighted sentence there says that this release covers all payment for labor, services, equipment, materials, furnished and or claims to the above reference project through November 30th of 02. Are these fairly standard contracts in the industry? Yes. You do it all the time? Yeah. This type of form is commonly used in this area, Your Honor, and I believe in other government contracts too. Forms similar to this. I can't tell you that the precise wording is the same. Well, they seem to be all typed up and ready to go. Yes. These are standard forms. I don't believe there's any issue about that in this case. That form also indicates you can sign this even though you haven't been paid. Now all it does is sets up a bar for claims and liens. Correct. Now. Not just for claims of lien under the bond, but all claims. If you look at it, it says and or claims on the above reference project. Yes. However, if Baugh said to C-4th, gee, I know you haven't been paid, or if Nordahl said I'm going to give you what I owe you, and there was another invoice, and for that period up to November, they paid him another $200,000, so be it, right? As long as they agree to that, yes. But as far as when we get the Miller Act, we get a whole different picture, right? Yes. Because. Tell me what this claim form is signed. We've read it. What does that mean regarding this Miller Act action? Correct. As far as the Miller Act is concerned, this operates as a bar to, and can we put that other chart up here? This basically, once they, the, no, the other one, the other chart. Is this in the record? This is not. This is an illustrative chart. And you have no objection to the use of this? No objection. All right. Thank you. What the Miller Act does is basically it provides that you unconditionally, Seaport, release all of your claims to this for any materials delivered prior to November 30th of 02. So basically it stops any material through. I think, right? Through 1130. Through 1130, right. That 1130 is included in that date. That's the unconditional side. Now, on the conditional side of the release, what it provides is if you are, if Seaport, you receive money later after this release is signed and that amount of money is greater than or equal to the amount that's listed there of 198,000, then you must apply that money to the period between November 30th of 02 and December 31st of 02. And if you look at the judge's order in this case, Judge Lasnik, that's exactly how he interpreted it. We have the judge's order here. And in paragraph three, Judge Lasnik held that the unconditional release signed by ISSC on January 27th released, basically released all materials delivered through November 30th. The conditional side provided that if there was a payment after January 22nd, which did occur, and that that would then operate to release the claims from November 30th through December 31st. That's what Judge Lasnik decided. But then the math and the damages got messed up because here's what actually how it was then applied. What occurred is the payment on January 31st, 03 was applied by Seaport to pre-November 30th, 02 payments or invoices that had actually been already released based on the unconditional side of that release. This is where I kind of get lost. I understand that ISC and Nordahl had five other jobs going. Correct. Okay. So in everybody's brilliance, what happens is Nordahl sends a big check. Correct. And then it's up to ISC to determine how to allocate it unless Nordahl tells them how to allocate it. Nordahl did tell them how to allocate in this instance. Okay. So they didn't apply $263,000. Correct. They implied only part of it. Where did they tell them how to apply it? Nordahl told them in the, and that's correct, Your Honor, Nordahl does tell them that. But that's immaterial in this instance because whether Nordahl, he incorrectly told them because they had already released. If Nordahl tells them to apply the money to the pre-November 30th invoices, those had already been released. Seaport told Bob. Nobody said, by the way, when you do this, it's going to bind everything in the Miller Act. See, what you're doing is you're talking about application to open account. How does that affect the Miller Act? Now, you tell me how, tell me what they said, first of all, and then tell me why it affects this Miller Act case. Well, first of all, what they said is, you're correct, Nordahl inappropriately told ISSC how to apply the payments. Well, you used the word inappropriately. When? Yeah. Where? Oh, in the checks. It's in the record, Your Honor, in the checks. They tell them how to apply the payment. We conceived that Nordahl told them that. Look, we know that Bob, Nordahl, and ISSC play games with lien releases. Everybody does because everybody wants to get paid. So depending on who wants to get money at a given time, out goes a lien release. I think we've already established that even though you do a lien release, it doesn't preclude the parties from paying somebody items that are on the lien release that haven't been paid before. Correct. And we know absolutely that that lien release, that unconditional lien release, that they didn't get $268,000. Correct. But they represent that they've been paid, though, Your Honor, to an innocent party, to my client, who doesn't know what actually the issues are between Nordahl. Your client may be innocent or not. The point is what does the relevance of the instruction on the 263.170 have to do with this Miller Act case? Well, because this has to do with how you interpret a release. The Miller Act issue is separate from how you interpret the release. This has to do, this is an interpretation of a release document. This first part of the argument is. And what the judge did, he cut off any further recovery as of the 11-30 date. Correct. Okay. And you're saying that was correct in him doing that? Absolutely correct. But when their payment came in, instead of applying the payment, the 263, to the invoices for which there had been no release, they applied it to the invoices for which the judge said had already been waived. Which were the earlier invoices. The fact of the matter is the way they did business is, you know, the big bundle of money comes. Right. And then they apply them to the oldest ones, no matter where the company in the sky is getting them. Regardless of what the release said. Right. Irrespective of the release. But the underlying payments, I guess where I'm confused is just because they did that, when the judge says you're not going to get any more money from 11-30, he's going strictly on the wording of the release. Correct. The fact that money slipped underneath is not material. What you're saying is you should still move that money forward. So you're running two sets of books here. Right. That's where I get lost. That's what I'm doing. I'm going to show you how those two sets of books work and how they should. I've showed you now what Seaport did, and I'm going to show you here what should have occurred. This is page 10 of our brief. And basically what should have occurred is what we start out with is ISSC is owed a total of $641,525. What occurs then, if you take the judge's order, paragraph 3 here, I'm not going to put it up there, the judge ruled that everything prior to November 30th, all of those material invoices were released and waived. So, therefore, you can't ever get, I mean, you take the tribe, three November 30th invoices have been released for those. That gets you then down to $362,831.80. The next step that occurs is the step where FAA then, after January 22nd or January 27th, makes the January 31st payment of $263,000. That is then applied to those invoices that occur between November 30th and December 31st. And there are only $192,000 in invoices in that period. So we apply that payment to those invoices, reducing then the claim amount down to $170,000. Then the third thing that occurs is when the February 27th payment occurs of $249,000, instead of applying all of those monies back here to the November 30th invoices, those should, because once the payment is made for December 30th, then the conditional side of the release is triggered, stops any more materials from December 30th forward. That means then that payments made thereafter should be applied to the post-December 31st invoices, reducing the total claim down to $11,065.80. That's the appropriate accounting using Judge Lasnik's order. Because as he said in his order in paragraph four, once the payment was made on January 31st, that triggered the conditional side of the release, barring any claims prior to November 31st, 2002. I'm going to spend just a second on the Miller Act and why they're not a proper party, why Seaport's not a proper party under the Miller Act. The Miller Act, basically the F.D. Rich case is probably the Supreme Court case that's controlling here. It says that in order for a subcontractor, the issue is whether Nordahl was a subcontractor or supplier. And if you use the five factors of the Aetna and the conveyor rental Aetna case here, if you use those five factors, the inevitable conclusion is that Nordahl is a supplier. We've given you three cases, two of them cited by the Ninth Circuit. That's the Pioneer Steel case and the Lloyd T. Moon case, also Clark v. Lloyd T. Moon. In both of those instances, the suppliers of beams and columns, which are fairly simple pieces, where they do no work on the project site, where their contract is between 5 to 9 percent of the total contract, are simply suppliers and not subcontractors. Our last argument is that even if all of these things, if you rule against us on all of these other issues, we still had a genuine issue of material fact at the trial court case as to the proper allocation of payments that should have been done here, which is a defense, an affirmative defense in the Miller Act case. What is the issue of fact? The issue of fact is whether Seaport knew or should have known, based on the fact that they executed these releases, that the source of money was coming from Baugh to Nordahl, and therefore they had to apply it to this project and not to other projects, those five other projects that you were talking about, Judge Brunetti. All right. Thank you. You can have the remaining time for rebuttal. Thank you. Good morning, Your Honors. Lance Dahl, may it please the Court, 9-4, appellee and cross-appellant Seaport Steel, sometimes referred to as ISSC. A couple of preliminary matters as to the purported issue of material fact, as to whether the Court should have determined that Seaport should have allocated the payments contrary to how Nordahl directed those allocations, that was determined by the Court in Seaport's favor. The Court held that defendants had failed to show that ISSC knew or had reason to know the lineage of funds that it received or that ISSC was otherwise under a duty to allocate the full amount of those payments to the whole barracks project. That was a big issue at the summary judgment level, and it disappeared at the appeal level. It's not in the appellant's brief. The common law on that issue is the General Electric wiring case and the Dakota Steel case. That was decided below, that was not raised above. That issue is not before the Court. All we're left with is a legal interpretation of these two, and if I may. So you're saying the misapplication of funds issues is not on appeal? Absolutely. That is not brought up in the appellant's brief, and we discussed that in our rebuttal brief, that there was no such discussion. That issue was absolutely abandoned. So we're left with simply an issue of, as a practical matter, there's the issue of the subcontractor status. But I'd like to skip that and go to the proper construction of these Miller Act claim waivers. And at the outset, that's all they are, Miller Act claim waivers. They are not a general release. And for starters, the Court did not misinterpret or somehow make an arithmetic error. Judge Lasnik understood the full effect of the unconditional release, and the effect was it released Miller Act claims through November 30, 2002. No Miller Act claim is made for that period. Isn't the significance of the fact that the lien is the most important thing? If you don't have a lien, you can go out and play all the games you want. But these are to get the release of the lien to keep going with the business, because if I lien your job, you've got a problem. And so this released the lien through, the unconditional released the lien through November 30. It had nothing to do with payment. Absolutely. Because they didn't get 268,000. And because of the way people were using their funds, Bob pays Nordahl, Nordahl spreads it all over the world, and then ICISSC gets part of that. And that's the risk that each party takes when they start signing liens. And there's no claim at that point. And that affects your client. Your client might have got some money, but you had no claim relative to the Miller Act. It was quite unwise to sign that. We lost $87,000. We otherwise would have had a Miller Act claim. We lost $87,000. You lost the claim if you brought a Miller Act, but if you went over with Uncle Guido and got the money, you got the money, right? Absolutely. And Bob's own document provides in bold this Miller Act waiver is enforceable if you sign it, even if you have not been paid. So no question about that. So Judge Lasnik properly applied the unconditional Miller Act claim. Well, you don't have any cross appeal, or do you? I have a cross appeal, and that's why that's very important. And it boils down to an amount just as a matter of construction of the four corners of this conditional release. The Court found, number one, having found that ISSC had no duty to allocate anything any different way than Nordahl had provided. That's a finding of fact in this case. It's a law of the case. Well, the Court, without any analysis, and I think if you read the Court's decision, it goes into great depth on everything except for this last point on the legal effect of the conditional release. The Court found or construed that document to mean that if ISSC received more than $198,000 after signing this conditional release on January 22nd, 2003, why, that means that it must have triggered the effect of the conditional release. Well, that is plainly error. That's at that. It cannot be the import and construction of a conditional release. Number one, that release anticipated that a check for $198,449 on this project would be paid by Nordahl to ISSC. That didn't happen. We know that in January, just about $19,000 was paid. And then ultimately in February, there was another $159,000. There was no such check, nor even a total check equaling $198,000. Well, I guess what counsel is, that's why counsel did the double bookkeeping. He said, oh, you've got all kinds of money. Underneath, supposedly money was being paid, but the money wasn't specified to go to this job. They just got big checks from Nordahl, gave big checks on all five jobs other than this one, right? If I understand your question, Nordahl always gave a remittance statement that was in great detail and always specified when it gave any check exactly how it was to be applied, and that's never been disputed in this case. Okay. But even though the release, the unconditional release was signed, they did specify payments to the pre-1130 invoices. Sure. And so what you're saying is when the number 19844315 is on the conditional release, there's nothing that shows that that amount was designated by Nordahl to be paid on this job. Absolutely. After 1130. It never was. Absolutely. You're absolutely correct. Now, then tell me where you go from there. Where I go from here is we talked about earlier that these are fairly standard industry forms, and what we're talking about in this appeal, in our cross appeal, is what's the proper construction of this standard industry form. If you followed Baugh's theory or thesis, and actually, because Baugh, for purposes of appeal, would like to agree with the Court's decision on this point, which I think is erroneous, and that is that when someone signs a conditional release for X amount, in this case it's 198,000, and they're providing a number of public projects, if 198,000 comes to them on any of those projects, in this case five projects, then it triggers the conditional release. That can't be the case. It leads to an absurd result. What if, just an example, what if you had six public projects, 100,000 each, and you signed six conditional releases, and then $100,000 payment comes in. Have you just released $600,000? Well, absolutely not. It was a conditional release. If you look on the right side of that form, it says project. I can't read that. I think it says F. Fort Lewis Barracks. Fort Lewis Hall Barracks. So you're saying that because this conditional and unconditional release are on the same form, right? Absolutely. That only the money that is earmarked by Nordahl when it sends money to ICC going to Fort Lewis goes against the 198,443 computation. Absolutely. Because they send a lot of money over there that is diagrammed on that double bookkeeping system. Right. But we do not know. I think there's some other diagram in your brief where it shows how much really came in after 1130 against the 198,443. Right? Right. Again, where did the judge make the error? Let's assume that the judge then has to do the accounting on the amounts between for the month of December. Where did he make the accounting error? Because that's what we're talking about, an accounting error. Right. By the judge. Right. Okay. The judge focused on the fact that on January 31st, I think, two payments came in, 100,000 and 163,000, a total of 263,000, of which Nordahl directed that $18,900 or thereabouts be allocated to this project. And where did the judge make the error? The judge – the judge's opinion says that – Where are you reading from, please? Oh, I'm reading at page 3 of the court's order on the so-called misallocation issue, and that's at ER 1254. On line 21, the judge says, contrary to ISSC's repeated assertions, the conditional release does not require that Nordahl provide a check for project invoices. So this was in its – Excuse me. What page was that again? Oh, I'm sorry. It's ER 1254, and it's page 3 of the court's decision, the memorandum decision. Okay. Line 21. Go ahead. Thank you. You're reading into the releases the job that's indicated up above. Absolutely. So you're saying it's an integrated document? In other words, if they sent – I mean, we have this kind of collision here where there's this double booking in that, you know, they've got all these projects going. Right. So money's coming in and it's getting allocated. But you're saying in a way that the allocation is separate from the release. Would that be another way of stating it? Well, the – at issue here is was there a Miller Act claim release. Right. And there can only be, under this conditional release, a Miller Act claim release when $198,000 is paid by Nordahl to ISSC on this project. Okay. Well, but that's – see, that's really the point is that Judge Lasnik is saying, well, if $263,000 comes in, ergo $198,000 has been paid, therefore the release kicks in. You're saying that the release has to be read in conjunction with the designation of project. Absolutely. Otherwise, it wouldn't make any sense in the abstract because you wouldn't release your other projects, for example. Sure. If you had some other projects, you wouldn't be releasing them through this document. No. Is that correct? That's absolutely correct. Well, not only that, the document doesn't make any sense then. If the right side is only for the barracks, what the heck is the left side? It seems to be a general release on everybody. And it isn't written that way. This is all one page. I take this wasn't composite. This is one document, one page. That's correct. And so then Lasnik, then you're saying, was incorrect in its interpretation. By its term, the release, which was designed by BSI to protect its interests, was triggered when Nordahl gave ISS a properly endorsed and negotiable check sufficient to cover the outstanding invoices on the whole barrack project without regard to the accounting mechanisms by Nordahl and ISSC. So he's using the gross term, give me a check, and away it goes. You're saying because this release was triggered to the barracks, that you had to get checks that were earmarked for the barracks before it triggered it. Well, absolutely. Otherwise, a contractor in Bob's position would always look back at a supplier who supplied on several public projects, look into their books and say, I find that you've got $100,000. Why, you have signed a conditional release for $100,000. I don't care if you've been paid a dime. I'm sorry, Your Honor. The unconditional release specifically says above reference job. The conditional release does not. Yes, it does, Your Honor. In the above reference job. It actually does. It does say that, yeah. Right. It's just above 1231, two lines up. Now, and not only that, check me if I'm right. At the time that this release was executed, ISSC was owed more than 198,443. In other words, you didn't. That number is not a specious number. In other words, it's different. That's true. Yeah. What you're saying is that when the money comes in, Nordahl says 18,000 of this is for the barracks. Is that right? That's correct. So you're saying that if 18,000, then you're still owed something in the neighborhood of 180 that you have not released. Is that correct? Well, this conditional release is based on a sum of 198,000. Right. And it doesn't contemplate partial releases. I suppose that would be yet another form. No, I'm not saying it's contemplating partial releases. I'm just saying that when the 263,000 rolls in, how much of that was directed to be for the barracks? 18,000-plus, which was exactly the amount which was then due. Okay. And I – Judge Brunetti had asked did we – were we owed more than 198,000. Yes, we were, because we'd supplied more than that. But in terms of how much was due, only about 18,000. Not only that, you are working with Norgal and allowing him to float money around. But what you said in your conditional release, go ahead and float your money around, but I'm not going to release my Miller Act claim on this job until I get 198,443. If you want to put money on these other jobs, because I know you've got them going, if I don't give you this deal, you're going to cave, but until you give me 198, Miller Act doesn't go away. That's the significance of the conditional release is the Miller Act claim. Lee, excuse me. I agree. I still have a problem. The unconditional release specifically says that the other sign has been paid and received progress payments for labor service equipment and material furnished to the above-referenced job. That doesn't say that on the conditional release. I agree. And the money has to come from the above-referenced job. I think that that both refer to. Well, the conditional release refers to. Well, it certainly could be drawn better if you wanted to say that this is this is boss form. They drafted it. It's worded differently. I'm looking at the mid. If I may understand. This item shall become effective for release. Yeah, but regardless of where the money came from, if he gets that sort of money, he unconditional releases this particular job. Your Honor, I think it has to apply to. I think that that's really. You know how to draw it when they mean that unconditional release. It says that. And then a conditional release doesn't say that. I guess I would offer there's really no serious dispute that that that these Miller Act lien releases are referring to the whole barracks project. Well, that's what your argument is. Yes. I understand. Your Honor. He says that for the condition for the unconditional release. So they know how to draw it when they want it. Let me ask you if they're how you interpret the word claims and rights of lien. If money has been expended, but payment is not due, do you have a claim under the under the conditional release? Your Honor, the Seaport has no contract with Baugh and no contract relationship. And that's very important. And as an arm's length and disinterested relationship here, what possible claim do we have? We only have, there is no common law claim against Baugh, no, certainly no state claim or mechanics lien. The only claim possible is the Federal Miller Act. And as such, even though the language seems to be a little broader, we would state that that refers to Miller Act claims. All right. Was there ever a check in the precise sum of 19844315 paid, precise check in that amount? No, Your Honor. That's correct, Your Honor. But you wouldn't rely on that interpretation as being the basis for the release not being due?    I would call it a brick in the wall, I suppose. Okay. Maybe with that, I think you've used your time. Did you have one final statement or are you? A final statement to sum up. Even Baugh wasn't under any illusion. I think this is a ladder construction that we ought to have all of these fancy sort of new accounting measures. And the record shows in March of 2003 had withheld, I mean, they protected themselves. They withheld $600,000 from Nordahl, put them out of business and in their own record they indicate that ISSC has lien rights to $373,000. That's exactly the amount we are asking for. That's the amount we should have received at the district court level. Thank you, Your Honor. Just a couple of points here, Your Honor. First of all, I want to go back to the allocation. And what you've got to keep in mind, please, is that Nordahl, if Nordahl gets to determine how Baugh's money is spent, Nordahl is always going to make sure that ISSC's other projects that are not Miller Act projects are paid first. That's not the way, and, you know, when you were talking about this, Judge Brunetti, and it seems like you understand how construction works, they're always trying to get these, Baugh is here the bonded entity. They're going to try to protect themselves in some manner to ensure that when these releases are executed, that it is through a date certain that they get that release. Of course, you could have protected yourself by putting more language in the way your money went out, too. I mean, everybody's running a risk based upon documentation. It takes some risk, but it's a calculated risk if people play, if people are up front about how they're working. Nobody's up front on this. No, nobody is because they're all floating money. I mean, the reality is that the government uses our money to build their projects. There's no question about that. In the end, here's the issue. Three days or four days after this, and everybody knows that no money is going to be paid to Nordahl unless and until these releases are signed. Four days after that, there's a payment made by Nordahl of $263,170. What I'm trying to get across is they're applying that all, they apply that $18,000, 18,000 of that, to the pre-November 30th invoices that they're saying are released. So we don't even get credit for that. But then they say the next payment of $240,000, that payment actually should have been applied here to these. We should get credit for that, which is the $159,000 that I showed you before in that other chart. We should get credit for that in this time period. That then triggers the conditional release. It's clearly Baugh's money that are coming to these guys. It's not like somebody isn't aware of it or we don't know what's going on. If your decision is that Nordahl gets to determine how the money is distributed, that would be grossly unfair to the general contractor because from here on forward after you make that decision in the Ninth Circuit, the supplier is going to make sure that all the non-bonded jobs are paid first and the general contractors will end up holding the bag. No. Isn't Baugh going to put something in its contract with Nordahl and anyone who's a supplier slash questionable subcontractor? Isn't that how it would work? Well, we do put things in there, but the only thing short of doing what we do here is to sign joint checks. When we do that, we get into all sorts of socioeconomic issues. Life is rough out in the construction world. It is. I'm going to tell you something. The key here is the lean on the job. If you want your job clean, then someone's going to have to redesign these things if someone's going to allow suppliers to spread money over six jobs. But if you, well... No, I'm just saying that I understand your argument and I understand this bookkeeping argument. The key here is the lean under the Miller Act, which gives the leverage to these lawsuits, and that's why these releases are so important. Right. Okay, then I'll take your argument and I'll look at what Judge Glasnick ruled, and it still works in our favor because the lean releases clearly say that as of November 30th, and they're not even disputing that. November 30th is gone. Then the December 31st is real simple because we get to December 31st simply based on that next payment. We get there. If you allow that payment to go back and be applied to prior November 30th, you're not even giving us credit for money that we've, that's clearly... So you're saying you can't give effect to the unconditional release if you do that. Yeah, that triggers that, as Judge Glasnick ruled. Then the only issue then is just a simple accounting issue after that, and where do you apply? They took $159,000 out of this payment, and you have that on your chart there. They took $159,000 and applied that... But that's a misapplication claim, and counsel says that's not up on appeal. That is on appeal, and that is in our materials, and we have argued that. That's in all of our papers. All we did for the purposes of the reply is we just separated that out to make it a little better so you could understand that we were trying to, we tried to keep, what we did is we mixed... Is your misapplication claim anywhere existent in your pleadings other than the reply brief? Yes, it is in our initial brief. In fact, they talk about that in their opposition. They talk about the misapplication. Let me ask you if we were to agree with you that as to 1130, there's like a big red line drawn. Yes. And you can't go behind. Right. But if we were to agree with Seaport's counsel with respect to the effect of the condition of release as to 198 or whatever money came in, would it then simply be a matter of accounting to apply those two principles? It would be, and you'd have to overrule Judge Lastny's decision. I understand that. I mean, I'm just saying that's sort of a half and half. You know, half was right and half was wrong. If we were to do that, it would still have to be then, I won't call it an allocation because that gets us into hot water. It would be an application of accounting. It's simply an accounting function at that point.  I think we have your argument in mind. I don't think you'll ever get there because I don't think they're a subcontract anyway. We do thank both counsel. After immigration, we have to stop and get our minds into these government contracts. And there's a lot of documentation. So thank both counsel for their arguments. And the case just argued is submitted. We're adjourned for today.
judges: Brunetti, McKeown, King